IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| JENNIFER SMITH, | Cause No. CV-19-06-GF-BMM-JTJ |
| Plaintiff, | |
| vs. | ORDER |
| ANDREW M. SAUL, Commissioner of Social Security, | |
| Defendant. | |

## INTRODUCTION

Plaintiff brings this action under 42 U.S.C. § 405(g) seeking judicial review of an unfavorable decision by the Commissioner of Social Security ("Commissioner" or "Defendant"). (Docs. 1 & 13.) The Commissioner denied Plaintiff's application for social security disability benefits beyond April 2014. (Doc. 9 at 22.) Defendant filed the Administrative Record on May 16, 2019. (Doc. 9.)

1

Plaintiff filed an opening brief in which she moves for summary judgment. (Doc. 13 at 7.) She asks the court either to reverse or remand the decision of the Administrative Law Judge ("ALJ"). (*Id.*) Plaintiff's motion is fully briefed and ripe for the Court's review. (Docs. 13, 14, & 15.)

## JURISDICTION

The Court has jurisdiction over this action under 42 U.S.C. § 405(g). Venue is proper given that Plaintiff resides in Cascade County, Montana. 29 U.S.C. § 1391(e)(1); L.R. 1.2(c)(3).

## PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits in September 2013, alleging disability beginning March 1, 2012. (Doc. 9 at 22.) The ALJ found that Plaintiff was disabled—with an impairment equaling Listing 3.09—from February 24, 2012, through April 1, 2014. (*Id.* at 22, 37.) The ALJ concluded further that, after April 1, 2014, through the date last insured, Plaintiff possessed the residual functional capacity to perform light work. (*Id.* at 28.)

Plaintiff appealed, and on reconsideration the ALJ denied a period of disability and disability benefits beyond April 2014. (*Id.*) Plaintiff filed a request for review, which the Appeals Council denied on December 13, 2018. (Doc. 9 at 11-14.) Plaintiff thereafter field the instant action. (Doc. 1.)

2

## STANDARD OF REVIEW

The Court conducts a limited review in this matter. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence also has been described as "more than a mere scintilla," but "less than a preponderance." *Desrosiers v. Sec. of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).

## BURDEN OF PROOF

A claimant is disabled for purposes of the Social Security Act if the claimant demonstrates by a preponderance of the evidence that (1) the claimant has a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months;" and (2) the impairment or impairments are of such severity that, considering the claimant's age, education, and work experience, the claimant is not only unable to perform previous work but also cannot "engage in any other kind of substantial gainful work which exists in the

3

national economy." *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000) (citing 42 U.S.C. §1382(a)(3)(A),(B)).

The Social Security Administration regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled. *Bustamante v. Massanari*, 262 F.3d 949, 953-954 (9th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof under steps one through four. *Bustamante*, 262 F.3d at 954. The Commissioner bears the burden of proof under step five. *Id.* The five steps of the inquiry are as follows:

1.  Is the claimant presently working in a substantially gainful activity? If so, the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2.  Is the claimant's impairment severe? If so, proceed to step three. If not, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3.  Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4.  Is the claimant able to do any work that he or she has done in the past? If so, the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5.  Is the claimant able to do any other work? If so, the claimant is

4

not disabled. If not, the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante*, 262 F.3d at 954.

# BACKGROUND

## I.   THE ALJ'S DETERMINATION

The ALJ followed the 5-step sequential evaluation process in evaluating Plaintiff's claim. At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017. (Doc. 9 at 24.) The ALJ further found that Plaintiff had not engaged in substantial gainful activity from February 24, 2012, through her last date insured of December 31, 2017. (Doc. 9 at 24.)

At step two, the ALJ found that through the date last insured, Plaintiff had the following severe impairments: polymyositis and dermatomyositis/ inflammatory arthritis, coronary pulmonale secondary to chronic pulmonary insufficiency/vascular hypertension. (Doc. 9 at 24.) The ALJ concluded that those severe impairments significantly limited Plaintiffs' ability to perform basic work activities and/or have more than a minimal effect on Plaintiff's ability to work. (Doc. 9 at 24.) The ALJ noted other medical impairments from which Plaintiff suffered, including as follows: hypothyroidism, sleep apnea, glaucoma, diabetes mellitus, headaches, depression, and anxiety. (Doc. 9 at 25.) The ALJ concluded

that those medically determinable impairments were nonsevere and reasonably expected to have no more than a minimal effect on Plaintiff's ability to work. (Doc. 9 at 25.)

At step three, the ALJ found that from February 24, 2012, through April 1, 2014, Plaintiff had an impairment or combination of impairments that met or medically equaled the severity of 3.09 described in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1. (Doc. 9 at 26.) The ALJ further found that after April 1, 2014, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled any impairment listed in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, app. 1. (Doc. 9 at 27.)

At step four, the ALJ found that, after April 1, 2014, through the date last insured, Plaintiff possessed the following residual functional capacity:

> [to] perform light work as defined in 20 CFR 404.1567(b) with some exceptions. Specifically, the claimant is able to lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally, is able to stand and/or walk for about six hours in an eight hour workday, sit for about six hours in an eight hour workday, and requires alternating between sitting, standing, and walking only as allowed by normal work breaks (every two hours). The claimant is occasionally able to climb ramps and/or stairs, is never able to climb ladders, ropes, or scaffolds, is frequently able to balance, kneel, crouch, and crawl, is occasionally able to reach overhead bilaterally, and must avoid concentrated exposure to extreme heat, to fumes, odors, dusts, gases, and poor ventilation, and to hazards such as wet, slippery, or uneven walking surfaces, to unprotected heights, or dangerous machinery.

(Doc. 9 at 28.)

Based on this residual functional capacity, the ALJ found that Plaintiff could perform her past relevant work as a teacher's aide after April 1, 2014, through the date last insured. (Doc. 9 at 35.) At step five, the ALJ concluded that Plaintiff remained capable of making a successful adjustment to other work that existed in numbers in the national economy considering Plaintiff's age, education, work experience, and residual functional capacity. (Doc. 9 at 37.) Thus, the ALJ concluded that Plaintiff was not disabled from April 1, 2014, through the date that she was last insured on December 31, 2017. (Doc. 9 at 37.)

## II.   Plaintiff's Position

Plaintiff argues that the ALJ erred in the six following ways: (1) failing to develop the record and consider certain records; (2) improperly determining that the records support an improvement listing as of April 1, 2014; (3) improperly discounting the findings and diagnoses and objective test results from multiple treating physicians; (4) failing to include headaches as a severe impairment; (5) denying Plaintiff's claim for disability benefits and credibility finding relative to Jennifer Smith's plan; and (6) failing to incorporate all of Jennifer Smith's impairments into the vocational consultant's hypothetical question. (Doc. 13.)

## III.   Commissioner's Position

The Commissioner asserts that the Court should affirm the ALJ's decision because she properly concluded that Plaintiff's impairments medically improved

such that she was no longer disabled after April 1, 2014. (Doc. 14 at 17.) Alternatively, if the Court determines that the ALJ committed harmful error, the Commissioner argues that remand is the appropriate remedy. (*Id.* at 17-18.)

## DISCUSSION

Plaintiff argues the ALJ erred in six distinct ways. For the reasons set forth below, the Court agrees that the ALJ improperly discounted the findings, diagnoses, and objective results from multiple treating physicians and, accordingly, improperly denied Plaintiff's claim for disability benefits after April 1, 2014. Those errors prove dispositive and the Court reverses the case for an award of benefits based on those errors those alone. It proves unnecessary to address Plaintiff's alternative arguments.

In assessing a disability claim, an ALJ may rely on the opinions of three types of physicians as follows: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ should afford each physician's opinion a certain amount of deference based on that physician's classification. A treating physician's opinion proves entitled to the greatest weight. *Id.* ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who did not treat

8

the claimant."); *see also* 20 C.F.R. § 404.1527(c)(2). An examining physician's opinion is entitled, in turn, to a greater weight than a nonexamining physician's opinion. *Lester*, 81 F.3d at 830.

An ALJ should afford a treating physician's opinion deference because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). Despite this deference, a treating physician's opinion is not necessarily conclusive as to either the physical condition or the ultimate issue of disability. *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.").

An ALJ should reject a treating physician's opinion only under certain circumstances. *Lester*, 81 F.3d at 830. An ALJ must provide "specific and legitimate reasons supported by substantial evidence in the record" when discounting a treating physician's uncontradicted opinion. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (internal quotations omitted); *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ may accomplish this task by setting forth "a detailed and thorough summary of the facts and conflicting clinical

evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

An ALJ must do more than simply offer her conclusions. An ALJ must set forth her own interpretations and explain why those conclusions, rather than the doctor's, are correct. *Reddick*, 157 F.3d at 725. A nonexamining physician's opinion cannot constitute, by itself, substantial evidence that justifies the rejection of a treating or examining physician's opinion. *Lester*, 81 F.3d at 831. A nontreating, nonexamining physician's findings can amount to substantial evidence if other evidence in the record supports those findings. *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

An ALJ may discredit a treating physician's opinions that are conclusory, brief, or unsupported by the record as a whole or objective medical findings. *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2001). An ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1980).

The uncontroverted opinions of the claimant's physicians on the ultimate issue of disability do not bind an ALJ, but she cannot reject those opinions without presenting clear and convincing reasons for doing so. *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). Accordingly, a court can reject a treating physician's

10

controverted opinion on disability only with specific and legitimate reasons supported by substantial evidence in the record. "In sum, reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1988) (internal citations omitted).

The ALJ found that Plaintiff's medically determinable impairments reasonably could be expected to cause her alleged symptoms. (Doc. 9 at 29.) The ALJ found further, however, that Plaintiffs' statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with medical evidence and other evidence in the record." (*Id.*) In making this finding, the ALJ considered the opinions of state agency medical consultants and treating physicians. (*Id.* at 29-34.)

The ALJ considered first the opinions of the state agency medical consultants. (Doc. 9 at 29.) The state agency medical consultant issued a determination dated June 22, 2015, that Plaintiff's medical condition had improved such that she was able to engage in light work activity. The state agency medical consultant's decision proved consistent with the opinion of Cory Hessel, Ph.D. The ALJ recognized that these opinions came from "non-treating, non-examining medical" sources whose opinions were based on "a thorough review of the available medical records and a comprehensive understanding of agency rules and

11

regulations." The ALJ viewed these opinions as "highly persuasive" and decided to afford them "significant weight" because the opinions were "internally consistent and well supported by a reasonable explanation and the available evidence." (*Id.* at 29, 34.)

The ALJ considered next the treating physicians' reports. Rheumatologist Elton Adams, M.D., began caring for Plaintiff in February 2012. At that time, Dr. Adams reported that Plaintiff presented in a wheelchair and had progressive muscle weakness to the point where she was no longer able to perform normal daily tasks on her own. (Doc. 9 at 29.) Dr. Adams's musculoskeletal examination confirmed generalized muscle weakness. Plaintiff complained of shortness of breath and lower extremity swelling. Dr. Adams ordered an echocardiogram that confirmed severe dilation of Plaintiff's right atrium and right ventricle secondary to severe pulmonary hypertension and a large circumferential pericardial effusion with evidence of visceral pericarditis. Dr. Adams recommended inpatient hospitalization pericardial effusion and right heart catheterization with cardiologists Dr. Whittle and Dr. Grasseschi. (*Id.*)

Dr. Adams noted that Plaintiff's condition improved throughout March 2012 with prednisone treatment. (Doc. 9 at 30.) Plaintiff still presented with muscle weakness, but her strength had improved. Based on Plaintiff's positive response to prednisone treatment, Dr. Adams modified her medication regimen and

12

transitioned her to a long-term medication in conjunction with reduction of prednisone. Regarding Plaintiff's pulmonary hypertension and pericardial disease, Dr. Whittle informed Dr. Adams that Plaintiff's symptoms had "nearly resolved." Dr. Adams described Plaintiff in June 2012 as continuing to do very well with symptoms related to polymyositis and pulmonary hypertension. Dr. Adams reported on July 3, 2012, that Plaintiffs' polymyositis appeared stable and that her muscle strength continued to improve. Those findings continued in August and September 2012. (*Id.*)

For the first sixth months of 2013, Plaintiff's condition gradually deteriorated due to the gradual taper of her prednisone treatment. (Doc. 9 at 30.) This deterioration cumulated in a nine-day hospitalization in June 2013, during which physicians intensified steroid therapy. Plaintiff also underwent another right heart catheterization. Plaintiff visited pulmonary vascular disease specialist Dr. Prekker in November 2013. Plaintiff reported that her breathing had improved and that she could perform daily living activities. Dr. Prekker noted that Plaintiff was still exhibiting symptoms, so he modified her medication regimen. (*Id.*)

The ALJ determined that Plaintiff's medical records demonstrated that her polymyositis and pulmonary hypertension remained well controlled throughout 2014. (Doc. 9 at 31.) The ALJ based that finding on lack of routine follow-up care or urgent care. Plaintiff visited an urgent care in March 2015 because she was

13

concerned that she had been exposed to a virus that could exacerbate her dermatomyositis, a condition for which Plaintiff continued on regular immunosuppression. Plaintiff did not have any other significant complaints during the examination and did not show symptoms indicating an exacerbation of dermatomyositis. (*Id.*)

Plaintiff saw Dr. Grasseschi in May 2015 and reported that she felt well and had no new concerns. (Doc. 9 at 31.) Dr. Grasseschi reviewed Plaintiff's symptoms and reported that Plaintiff reported no new respiratory, cardiovascular, musculoskeletal, or neurological complaints. Dr. Grasseschi recommended a follow-up echocardiogram. That echocardiogram occurred on October 5, 2015. Plaintiff's four cardiac chambers appeared normal, including normal right heart pressures and mild amounts of pulmonary insufficiency, mitral regurgitation, and tricuspid regurgitation. *(Id.)*

Dr. Grasseschi saw Plaintiff for a follow-up appointment on October 13, 2015. (Doc. 9 at 31.) Dr. Grasseschi described Plaintiff as experiencing multiple secondary symptoms from a chronic illness including decreased appetite, depression, anxiety, dyspepsia, and insomnia. Dr. Grasseschi explained that Plaintiff is chronically immunosuppressed and susceptible to community-acquired illnesses. (*Id.*) Plaintiff described her symptoms as including persistent muscle weakness, headaches, easy bruisability, decreased appetite, sensitivity to the sun,

14

intermittent fevers and chills, numbness in her feet, decreased stamina, chronic joint and muscle pain, and poor exercise intolerance. (*Id.* at 31-32.) Plaintiff reported fatigue, dyspnea, back pain, joint pain, and joint swelling. (*Id.* at 32.) Physical examination showed no edema, normal respiratory and cardiovascular functioning, and normal vascular functioning. (*Id.*)

Dr. Grasseschi stated that Plaintiff's severe dermatomyositis was associated with recurrent hospitalizations and severe pulmonary hypertension. (Doc. 9 at 32.) Dr. Grasseschi acknowledged Plaintiff's improvements, but also stressed in his October 2015 report that Plaintiff required chronic immunosuppression and that her overall diagnoses represented life-threatening conditions. He noted Plaintiff's chronic symptoms including severe weakness and chronic musculoskeletal pain secondary to inflammatory myopathy. Dr. Grasseschi and Dr. Adams agreed that Plaintiff's multiple comorbidities limited her from working and that she would benefit from disability. Dr. Grasseschi concluded that Plaintiff "should be disabled and receive support" because her "[i]mmune deficiency from medication makes her prone to illnesses acquired in the community." (*Id.*)

Dr. Grasseschi and Dr. Adams continued to care for Plaintiff throughout 2016. (Doc. 9 at 32.) Plaintiff's symptoms remained well-controlled as the physicians continued to adjust her medications to address various issues. (*Id.* at 32-33.) Plaintiff followed up with Dr. Grasseschi throughout 2017. Dr. Grasseschi

15

continued to adjust certain medications but noted that Plaintiff's conditions remained generally "well controlled." (*Id.*)

Dr. Grasseschi expressed his opinion on Plaintiff's disability status in a progress report dated March 23, 2017. (Doc. 9 at 33.) He noted that Plaintiff needed disability benefits for her pulmonary hypertension. He stated that Plaintiff's "pressures are better controlled at this point, but she has come close to dying with . . . heart failure twice in the past. I agree with her application for disability." Dr. Adams also supported Plaintiff's application for disability benefits in March 2017. Dr. Adams described Plaintiff's muscle weakness in her upper and lower extremities related to dermatomyositis and stressed Plaintiff's shortness of breath related to pulmonary hypertension. (*Id.*)

Physical Therapist Dean Orvis conducted a functional capacity evaluation with Plaintiff in November 2017. (Doc. 9 at 34.) Dr. Orvis concluded that Plaintiff could perform a reduced range of sedentary work activity involving lifting no more than a maximum of 5 pounds, work activity that requires no crouching or kneeling, occasional forward bending, standing, and climbing of stairs, never climbing ladders, occasionally walking, but rarely sitting, as the claimant reported a need to change positions frequently between sitting and walking. (*Id.*)

Dr. Grasseschi completed another report in April 2018, where he opined that Plaintiff was limited to a very narrow range of sedentary work activity. (*Id.*) He

16

based his opinion on Plaintiff's weakness and muscle pain with associated pulmonary hypertension, dermatomyositis, and a mixed connective tissue disorder. (*Id.*)

The ALJ decided to afford "little weight" to Dr. Grasseschi's, Dr. Adams's, and Dr. Orvis's opinions, despite their statuses as treating and examining sources. In rejecting their opinions, the ALJ needed to do more than offer her conclusions. *See Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007). The ALJ needed to set forth her own interpretations and explain why those interpretations, rather than the doctors' opinions, are correct. *Id.* In most cases, the treating physicians' opinions remain entitled to the greatest weight and should be adopted. *Lester*, 81 F.3d at 830.

Put simply, the ALJ must provide a good reason for the weight that she affords the treating physicians' opinions. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ's reasons for affording Dr. Grasseschi's, Dr. Adams's, and Dr. Orvis's opinions such little weight prove insufficient. As explained below, the ALJ failed to explain adequately why her interpretations, rather than the doctors' opinions, were correct. She accordingly erred by affording such little weight to treating source's opinions.

The ALJ explained that she afforded little weight to Dr. Grasseschi's October 2015 opinion because, between Plaintiff's May 2015 and October 2015

appointments, Plaintiff received a letter notifying her that she no longer qualified for disability benefits because her medical condition had improved. (Doc. 9 at 32, 101.) The ALJ attributed Dr. Grasseschi's October 2015 opinion of Plaintiff's medical condition to Plaintiff's change in disability status. (Doc. 9 at 32.) The ALJ noted that, "[w]hile not dispositive for the reason that this particular progress report is in significant contrast to previous progress reports, the undersigned notes that, between this visit and the [Plaintiff's] previous visit with Dr. Grasseschi, the [Plaintiff] had received a June 2015 letter informing her of the closed period if disability and determination of medical improvement." (*Id.*) No evidence supports the ALJ's assumption that in October 2015, Dr. Grasseschi, a physician in good standing, altered his medical assessment and resulting opinion based on the fact that Plaintiff had been informed that her disability benefits were ending. The ALJ's unsupported assumption otherwise (Doc. 9 at 32) proves offensive to Dr. Grasseschi's reputation.

The ALJ also discounted Dr. Grasseschi's March 2017 opinion that Plaintiff was disabled. The ALJ stated that it appeared to her that Plaintiff had been "essentially asymptomatic since 2014, only continuing to improve on her treatment regimen consisting of no more than routine medication management and occasional laboratory testing." (Doc. 9 at 33.) The ALJ similarly discounted Dr. Grasseschi's April 2018 opinion. (*Id.* at 33) The ALJ "emphasize[d] that [Dr.

18

Grasseschi's] opinions are based upon medical impairments of pulmonary hypertension and dermatomyositis, both of which he continues to describe as under good control and essentially in full remission with prescribed medications." (Doc. 9 at 33.)

The ALJ similarly afforded Dr. Adams's March 2017 opinion minimal weight for the same reasons that she gave Dr. Grasseschi's opinions minimal weight. (Doc. 9 at 34.) The ALJ likewise gave Physical Therapist Dr. Orvis's overall conclusion minimal weight because "some of his commentary relie[d] specifically on the [Plaintiff's] subjective reporting of limitations, including relying on self-limiting reports of pain and fatigue." (*Id.*) The ALJ viewed Dr. Orvis's recommended limitations as "ostensibly inconsistent with multiple normal observations and normal objective findings." (*Id.*)

The ALJ discounted all three treating source's opinions of Plaintiff's disability status based on her view that Plaintiff's symptoms were well-controlled. (Doc. 9 at 34.) The record demonstrates, however, that Dr. Grasseschi and Dr. Adams actively continued to manage Plaintiff's medications and made changes based on Plaintiff's responses. (*Id.* at 32-34.) Both doctors opined that Plaintiff continued to suffer from pulmonary hypertension that inhibited her ability to perform many tasks. (Id. at 33-34.)

19

The ALJ compounded her error by giving "significant weight" to the findings and opinions of "non-treating, non-examining medical sources." (Doc. 9 at 34.) She viewed these sources' opinions as "based on a thorough review of the available medical records and a comprehensive understanding of agency rules and regulations." The ALJ found that the opinions were "internally consistent and well supported by a reasonable explanation of the available evidence." (Doc. 9 at 34.) The exact same finding could be drawn from Dr. Grasseschi's, Dr. Adams's, and Dr. Orvis's opinions, and, as treating sources, their opinions are entitled to deference. *See Morgan*, 169 F.3d at 600.

An ALJ only may discredit a treating physician's opinions that are conclusory, brief, or unsupported by the record as a whole or objective medical findings. *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2001). Dr Grasseschi and Dr. Adams's opinions were not conclusory, brief, or unsupported by the record or objective medical findings. The physicians were "employed to cure" Plaintiff and had "a greater opportunity to know and observe the [Plaintiff] as an individual." *See id.* The ALJ committed legal error when she failed to provide a good reason for failing to afford any deference to the treating physician's opinions. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

"Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart*, 379 F.3d 587,

593 (9th Cir. 2004). When the record is fully developed and further proceedings would serve no useful purpose, the Court may remand for an immediate award of benefits. *Id.* Remand for an award of benefits proves appropriate if there are no outstanding issues that must be resolved before a determination of disability can be made and if it is clear from the record that the ALJ would be required to find the claimant disabled if she properly credited a treating or examining physician's opinion. *Id.* (citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000)).

Remand for an immediate award of benefits proves appropriate here. The record is fully developed, and further proceedings would serve no useful purpose. No outstanding issues exist that must be resolved before a determination of disability can be made. It is clear from the record that the ALJ would have been required to find Plaintiff disabled beyond April 1, 2014, if the ALJ had credited Dr. Grasseschi's, Dr. Adams's, and Dr. Orvis's opinions. *See Beneke*, 379 F.3d at 593. The Court will reverse the Commissioner's final decision denying Plaintiff disability insurance benefits and remand for an immediate award of benefits.

## ORDER

Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. 13) is **GRANTED**.

2.   The Commissioner's final decision denying Plaintiff's claims for disability insurance benefits is **REVERSED** and **REMANDED** for an immediate award of benefits from April 1, 2014, through the date last insured.

3.   The Clerk of Court is directed to enter judgment accordingly.

DATED this 5th day of June, 2020.


_____
Brian Morris, Chief District Judge
United States District Court

22